# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tina A. Gile,                                    Civ. No. 10-461 (JNE/JJK)

      Plaintiff,

v.                                    **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

      Defendant.

---

Gerald S. Weinrich, Esq., Weinrich Law Office, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Tina A. Gile seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability-insurance benefits. The parties have filed cross-motions for summary judgment. (Doc. Nos. 8, 19.) This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied, and Defendant's motion be granted.

**BACKGROUND**

## I.    Procedural History

Plaintiff filed an application for disability insurance benefits and supplemental security income on June 25, 2007, alleging a disability onset date of July 3, 1984.  (Tr. 144.)   The Social Security Administration ("SSA") denied Plaintiff's applications initially (Tr. 65), and again upon receipt of her requests for reconsideration.  (Tr. 76.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), on October 19, 2007.  (Tr. 80.)  On July 21, 2009, the ALJ conducted a hearing (Tr. 25), and on September 23, 2009, the ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 18.)  Plaintiff sought review of the ALJ's decision, and on December 18, 2009, the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  This denial of review made the ALJ's September 23, 2009 decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

On February 17, 2010, Plaintiff filed this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). On May 4, 2010, Defendant filed an Answer along with a certified copy of the Administrative Record (Doc. Nos. 5, 6), and the parties then cross-moved for summary judgment as provided in Local Rule 7.2.  (Doc. Nos. 8, 19.)

## II.    Factual Background and Medical History

Plaintiff, currently 63 years old, was 37 years old in 1984, the date of her alleged onset of disability. (Tr. 110.)  Plaintiff is a high-school graduate.  (Tr. 141.)  She owned a beauty salon between 1970 and 1981, and had no reported income since 1981. (Tr. 32-33, 135-36, 176.)  Plaintiff claimed she was unable to work due to injuries from a car accident in July 1984. (Tr. 29, 135.)

In July 1984, Plaintiff was involved in an automobile accident.  The car in which she was riding was broadsided by a dump-truck.  (Tr. 29, 34, 178-79, 183.)  Plaintiff reported that she was unconscious for about 10 minutes, suffered four fractured ribs, and hurt her left shoulder.  (Tr. 178-79.)

Plaintiff's submitted medical records begin on January 2, 1985.  In January 1985, Plaintiff had gnawing pain in her shoulder with some tingling down to her wrist.  (Tr. 178.)  She claimed that her symptoms were aggravated when she worked with her arms elevated such as vacuuming.  (Tr. 178.)  She also reported receiving physical therapy and chiropractic treatments, which made her feel worse.  (Tr. 178.)  On examination, Plaintiff was tender around her collar bone, had tingling down her arm, but had a full range of motion in her shoulder.  (Tr. 178.)  Dr. Tomkins indicated that Plaintiff had a possible thoracic outlet syndrome, and discussed postural exercises and physical therapy with her.  (Tr. 178.)  In April 1985, Plaintiff saw Dr. Hutter at the Gundersen Clinic. (Tr. 179-80).  She complained of constant pain in her left shoulder and upper chest with occasional tingling in her left arm.  (Tr. 179.)  Plaintiff stated that using her left

arm, as when vacuuming, exacerbated her symptoms. (Tr. 179.)  Dr. Hutter

noted that cervical spine and left shoulder x-rays were essentially normal. (Tr.

179, 190.)  On examination, Plaintiff exhibited mild decreased sensation in the

C5 or C6 distribution; assymetric reflexes in her arms; some tenderness along

the cervical spine; exquisite tenderness over one of the costchondral joints (rib

joints) on the left; normal muscle tone and strength throughout her shoulder

girdle and arms; and a normal range of motion in her neck. (Tr. 180.) Dr. Hutter

started Plaintiff on Amitriptyline. (*Id.*)   He also noted that Plaintiff's EMG and

nerve conduction testing showed a mild upper trunk left brachial plexopathy.[1] (Tr.

180, 192.)  Dr. Hutter indicated that a good portion of her pain seems

musculoskeletal in nature.  (Tr. 180.)

   Then, in July 1985, Plaintiff saw Dr. Hutter again and stated that the

Amitriptyline helped but expressed concern that she was developing some

tolerance to the medication. (Tr. 181.)  Plaintiff also reported headaches that Dr.

---

[1]     According to the Mayo Clinic:

   brachial plexus injury is an injury to the network of nerves that sends
   signals from your spine to your shoulder, arm and hand. A brachial
   plexus injury occurs when these nerves are stretched or, in the most
   serious cases, torn. This usually happens when your shoulder is
   pressed down forcefully while your head is pushed up and away
   from that shoulder.  Brachial plexus injuries are common in contact
   sports, but they can also result from auto accidents, falls,
   inflammation and tumors. . . Minor injuries may get better on their
   own, but severe brachial plexus injuries require surgical repair.

Mayo Clinic, *Brachial Plexus Injury*, http:www.mayoclinic.com (last visited
January 6, 2011)

Hutter opined were likely a result of muscle contractions associated with her brachial plexopathy.  (Tr. 181.) Dr. Hutter increased her Amitriptyline dosage and noted she would undergo biofeedback training.  (Tr. 181.)  Between July and August 1985, Plaintiff attended five biofeedback sessions.  (Tr. 181-82.)  Doctor Beardsley noted that Plaintiff  was making satisfactory progress, and that she reported no severe headaches by the end of July.  (Tr. 182.)  However, Plaintiff reported a sore shoulder after having to help out with an emergency household job in August. (*Id.*)

In October 1985, Plaintiff underwent a consultative examination with Dr. Bouri in connection with her SSI claim.  (Tr. 182, 184.)  Dr. Bouri concluded that Plaintiff had post traumatic left upper extremity discomfort, most likely secondary to cervical myofascial strain and mild left brachial plexopathy.  (*Id.*)  He also concluded that she felt fairly unremarkable with no significant residual motor or sensory deficits.  (Tr. 184.)  Plaintiff did not keep a follow-up appointment with Dr. Hutter later that month.  (Tr. 182,184.)

Two years later, in October 1987, Plaintiff's then-attorney asked Dr. Taylor to evaluate Plaintiff.  (Tr. 183-86.)  Dr. Taylor examined Plaintiff and reviewed her medical records.  (Tr. 183-85.)  On examination, Plaintiff's gait and station were normal; her back mobility was good; her cervical and shoulder range of motion were normal; her biceps and triceps reflexes were asymmetric; her grip strength was mildly reduced on the left; and she was able to hop on one foot, but in a somewhat discoordinated fashion.  (Tr. 185.)  Dr. Taylor indicated that Plaintiff

had good resolution of her problems and a good future prognosis. (Tr. 185.) He noted that Plaintiff's complaints were not fully correlated by the physical findings and opined that Plaintiff had not sustained any permanent disability. (Tr. 186.) On November 4, 1987, Plaintiff saw Dr. Hutter for complaints of low back and leg pain. (Tr. 186.) Plaintiff also reported that her left arm symptoms had not changed since 1985. (Tr. 186.) She told Dr. Hutter that she was a wildlife artist and needed to walk around in the woods to take pictures for her paintings. (Tr. 186.) She also reported that she had been seeing a chiropractor every week or two, which helped her back pain. (Tr. 186.) On examination, Plaintiff exhibited asymmetric reflexes in her biceps and triceps, and normal motor strength throughout both arms. (Tr. 186.) Dr. Hutter suggested that Plaintiff follow up with a rehabilitation specialist. (Tr. 187.)

On November 10, 1987, Plaintiff saw Dr. Timming on referral from Dr. Hutter. (Tr. 187-88.) Plaintiff reported that she was very inactive for about a year and a half after her accident but that orthodontic treatment alleviated her headaches in early 1987 and allowed her to be more active. (Tr. 187.) She stated that she was receiving chiropractic treatments for back pain and left upper extremity pain and that she had very little in the way of pain. (Tr. 187.) She claimed that she experienced increased pain with light housekeeping and walking in the woods. (Tr. 187.) Plaintiff reported taking only occasional Tylenol for her pain. (Tr. 188.) The examination was generally unremarkable. (Tr. 188.) Dr. Timming assessed Plaintiff with chronic low back pain, chronic neck and left

arm pain, and possible physical deconditioning. (Tr. 188.) He recommended physical therapy and a general conditioning program. (Tr. 188.) Plaintiff saw Dr. Timming again in December 1987. Her physical examination was again generally unremarkable. (Tr. 189.) Plaintiff was able to walk in a normal manner, both on her heels and her toes. (*Id.*) Plaintiff's trunk flexibility was completely full. (*Id.*) Dr. Timming noted that Plaintiff's examination of the low back and bilateral lower extremity was normal. (*Id.*)

In July 2007, state-agency reviewing physician Dr. Grant completed a physical residual functional capacity assessment regarding Plaintiff. (Tr. 197-204.) Based on his review of the record, Dr. Grant opined that Plaintiff retained the capacity for light work with limitations in reaching. (Tr. 198, 200.) In September 2007, state- agency-reviewing physician Dr. Salmi affirmed Dr. Grant's assessment as written. (Tr. 209-10.)

## III. Testimony at the Administrative Hearing

### A. Plaintiff's Testimony

At the hearing, Plaintiff testified that, since her accident in 1984, she had experienced problems with her shoulders, hips, hands, and arms. (Tr. 31, 34, 36, 51.) She complained of experiencing significant pain, but only remembered taking Ibuprofen and Tylenol. (Tr. 41-42.) She reported that she did very light housework, went grocery shopping with her husband, and took take care of her personal hygiene. (Tr. 44-45, 48-50.) She stated that she watched a lot of television, but that she was "sitting up and down". (Tr. 46.) Plaintiff claimed that

she could walk for half an hour, sit for half an hour before needing to stand and was unable to lift a 25-pound bag of dog food. (Tr. 37-38, 53.)

**B.    Medical Expert Testimony**

Dr. Paul Gannon testified as a medical expert at the July 2009 administrative hearing.  (Tr. 54-56.)  He testified that the record showed that Plaintiff had a brachial plexus injury that met the requirements of Listing § 11.08[2] through November 1987, and that she subsequently was functioning at the light level.  (Tr. 54-56.)

**C.    Vocational Expert Testimony**

Karl Botterbusch testified as a vocational expert at the July 2009 administrative hearing. (Tr. 56-58.) The ALJ asked the vocational expert to consider a 40-year old individual with Plaintiff's educational background, who could perform light work with a sit/stand option, no power gripping on the left, not much twisting or body movement, and no work around dangerous heights or operating machinery. (Tr. 56-57.)  In response, Botterbusch testified that this individual could perform the job of an office helper or a photocopy machine operator.  (Tr. 57.)

---

[2]    Listing § 11.08 is satisfied where Plaintiff suffers from "[s]pinal cord or nerve root lesions, due to any cause with disorganization of motor function as described in 11.04B." Section 11.04B, in turn, requires evidence of "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."

## IV.     The ALJ's Findings and Decision

On February 27, 2009, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act from January 4, 2006, through the date of the decision, therefore denying Plaintiff's application for disability-insurance benefits.  (Tr. 11-18.)  The ALJ followed the five-step procedure set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4).  The Eighth Circuit Court of Appeals has summarized these steps as follows:  (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff last met the insured-status requirements of the Social Security Act on December 31, 1986.  (Tr. 13.)  He found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of July 3, 1984 through her date last insured of December 31, 1986,

therefore meeting the requirement at the first step of the disability-determination procedure.  (Tr. 13.)  At step two, the ALJ found that Plaintiff had the following severe impairments:  mild left brachial plexopathy and musculoligamentous low back pain.  (*Id.*)

At step three, the ALJ found that none of Plaintiff's impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14.)  Specifically, the ALJ concluded that Plaintiff did not meet the requirements of Listing § 11.08 because there was no evidence in the medical record to establish significant spinal cord or root nerve abnormalities, and no evidence of persistent disorganization of motor function resulting in sustained disturbance of gross and dexterous movements of gait and station. (*Id.*)  The ALJ also noted that aside from some mild left upper extremity weakness, Plaintiff maintained good strength in her upper and lower extremities bilaterally, and had normal gait and station.  (*Id.*)  Accordingly, the ALJ did not give significant weight to the testimony of a medical expert, Dr. Gannon, that Plaintiff's impairments equaled the requirements of § 11.08 of the Listings.

The ALJ determined that Plaintiff had the RFC to perform "light work as defined in 20 CFR 404.1567(b) as lifting and carrying 20 pounds occasionally and 10 frequently; standing and/or walking 6 hours of an 8 hour day, with a sit stand option every hour; sitting 6 hours of an 8 hour day; performing tasks that require no more than occasional twisting of the trunk; involving only limited overhead reaching with the left upper extremity; with no power gripping with the

10

left extremity; and with no dangerous heights or hazardous moving machinery."
(*Id.*)  In reaching this RFC determination, the ALJ considered Plaintiff's subjective complaints but found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 15.) The ALJ then turned to the medical evidence in the record, including the findings of Dr. Tomkins, Dr. Hutter, Dr. Grant, and Dr. Salmi to support his conclusion that Plaintiff's subjective complaints were not substantiated by the objective medical evidence in the record.  (Tr. 15, 16.) The ALJ also considered Plaintiff's daily activities—that she groomed and bathed herself, took care of the cats and dogs, did dishes, cleaned the house, read, watched TV, went for walks, cooked, did laundry, drove a car, went shopping, paid bills, handled finances, painted pictures, went to church and ran errands.  (*Id.*)  He also noted that Plaintiff had no reported medication side effects and received only conservative medical treatment.  (*Id.*)

As to Plaintiff's work history, the ALJ noted that her earnings record was consistent with limited part-time employment, which may indicate a lack of interest or need for part time employment or suggest that her lack of employment is unrelated to her impairments.  (Tr. 16.)  Ultimately, the ALJ found that the objective medical evidence was inconsistent with her complaints of disabling physical limitations, but accommodated her resulting limitations by restricting Plaintiff to a range of light work.  (*Id.*)  To that effect, the ALJ noted that while he

considered and gave substantial weight to the opinions of the state agency physicians who concluded that Plaintiff is capable of performing light work, the ALJ did not adopt those opinions in their entirety because he further reduced her RFC to reflect the limitations suggested by Plaintiff's subjective complaints. (*Id.*)

At step four of the disability determination procedure, the ALJ noted that Plaintiff had no past relevant work activity in the last 15 years. (*Id.*) However, at step five, based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 17.) Thus, the ALJ denied Plaintiff's application.

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security Disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."
42 U.S.C. § 423(d)(2)(A).

Review by the Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings. *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record as a whole for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell*

*v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability-insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Further, the opinions of non-treating, non-examining physicians "do not normally constitute substantial evidence on the record as a whole."  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003)).

While the "ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case" *Vossen*, 612 F.3d at 1016 (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)), "the burden

14

of persuasion to prove disability and demonstrate RFC remains on the claimant."
*Id.* (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  Importantly,
the ALJ need not seek "additional clarifying statements from a treating physician
unless a crucial issue is undeveloped." *Stormo*, 377 F.3d at 806.

## II.    Analysis of the ALJ's Decision

Plaintiff alleges two errors in the ALJ's evaluation of her disability claim.
First, she alleges that the ALJ erred by not giving substantial weight to the
opinion of the independent medical expert, Dr. Gannon.  Second, she contends
that the ALJ did not properly assess the credibility of Plaintiff's subjective
complaints.

### A.    Evaluating the Medical Expert's Opinion

This Court finds that the ALJ did not err by not giving significant weight to
Dr. Gannon's opinion that Plaintiff met or equaled the requirements of Listing of
Impairment § 11.08.  First, Dr. Gannon is not Plaintiff's "treating source," and as
a result, the ALJ need not give controlling weight to his opinion.  *See* 20 C.F.R.
§§ 404.1527(d)(2), 416.927(d)(2) (describing the weight to be given to medical
opinions of a treating source).  And a non-treating physician's assessment does
not constitute substantial evidence if it is inconsistent with other medical
evidence in the record.  *See Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th
Cir. 2005) ("A non-treating physician's assessment does not alone constitute
substantial evidence if it conflicts with the assessment of a treating physician.").

Second, Listing § 11.08 is satisfied where Plaintiff suffers from " *[s]pinal cord or nerve root lesions, due to any cause* with disorganization of motor function as described in 11.04B." (emphasis added). Section 11.04B, in turn, requires evidence of "[s]ignificant and persistent disorganization of motor function *in two extremities,* resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." (Emphasis added). Plaintiff bears the burden of proof in establishing that her impairment satisfies all of the criteria of a particular section of the Listing of Impairments. *Sullivan v. Zebley,* 493 U.S. 521, 530-31 (1990); *Johnson v. Barnhardt*, 390 F.3d 1067, 1070 (8th Cir. 2004). Here, the ALJ rejected the limitations imposed by Dr. Gannon's opinion, including his finding that Plaintiff's condition met or equaled Listing § 11.08, because those limitations were inconsistent with the other medical evidence in the record. *See* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). The ALJ specifically found that there was no evidence in the medical record to establish significant spinal cord or root nerve abnormalities, and no evidence of persistent disorganization of motor function resulting in sustained disturbance of gross and dexterous movements of gait and station. (Tr. 14.) The ALJ also noted that aside from some mild left upper extremity weakness, Plaintiff maintained good strength in her upper and lower extremities bilaterally, and had normal gait and station. (*Id.*)

16

This Court concludes that the ALJ's findings are supported by substantial evidence in the record as a whole. For example, in January and February 1985, Plaintiff exhibited a full range of motion in her shoulder, had normal muscle tone and strength throughout her shoulder girdle and arms, and a normal range of motion in her neck. (Tr. 178, 180.) In October 1985, Plaintiff had no significant residual motor or sensory deficits. (Tr. 184.) In October 1987, Plaintiff's gait and station were normal and her cervical and shoulder range of motion was also normal. (Tr. 185.) In November 1987, Dr. Hutter observed that Plaintiff had normal motor strength throughout both arms. (Tr. 186.) And, according to Dr. Timming, in November and December 1987, Plaintiff had no motor or range of motion deficits. (Tr. 189-190.)

Plaintiff contends that Dr. Gannon's testimony that Plaintiff's brachial plexopathy met the Listing § 11.08 is amply supported by the medical records. But the only evidence Plaintiff relies on are Plaintiff's own subjective complaints and self-descriptions of her condition, not the medical examination findings and notations made by Dr. Hutter during her visit at the Gundersen Clinic in Wisconsin:

> She describes constant pain in the left shoulder area and into the left upper chest both anteriorly and posteriorly with aching involving her entire left upper extremity. Occasional tingling in the left arm diffusely. She says the left arm always feels cold. She has noted no color changes in the left arm. In addition she has left posterior neck pain. All of these things seem to be worse when she is using the left arm in any way. For example the pushing and pulling motion of vacuuming

> really sets of a lot of pain. She is bothered especially by
> sharp pain on left anterior chest area along the border
> of the sternum. When the weather is very cold, she has
> been bothered by headaches which she describes as a
> steady pain that involves the entire left side of her head
> with some stiffness in her neck. . . .
>
> In addition she has some occasional tingling of right
> lower extremity which is worse when she is walking and
> when she lies down.

(Doc. No. 9, Pl.'s Mem. in Supp. Summ. J. 9 ("Pl.'s Mem.") (quoting Tr. 179.))

Indeed, during that examination, Dr. Hutter noted that cervical spine and left shoulder x-rays were essentially normal. (Tr. 179, 190). He also noted that that Plaintiff exhibited mild decreased sensation in the C5 or C6 distribution; normal muscle tone and strength throughout her shoulder girdle and arms; and a normal range of motion in her neck. (Tr. 180). Ultimately, Dr. Hutter concluded that Plaintiff's EMG and nerve conduction testing showed a mild upper trunk left brachial plexopathy. (Tr. 180, 192.) That opinion was adopted by the ALJ, who found that Plaintiff was severely impaired by mild left brachial plexopathy and musculoligamentous low back pain. (Tr. 13.) But nothing in the April 1985 Gundersen report by Dr. Hutter supports Plaintiff's contention that her mild left brachial plexopathy equaled "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." Listing § 11.08.

Plaintiff also contends that the ALJ should have given substantial weight to Dr. Gannon's opinion because he is "well familiar with the requirements of the

social security administration" and because neither Plaintiff nor the Government challenged his medical qualifications. (Doc. No. 9, Pl.'s Mem. 7.) But "the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Here, the ALJ rejected the conclusion of Dr. Gannon and instead relied on the opinions of other doctors in the record before him. Ultimately, even assuming there is evidence in the medical record to support Dr. Gannon's conclusion that Plaintiff's mild brachial plexopathy met one of the listed impairments, this Court may not reverse the ALJ's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Here, the ALJ's adverse disability conclusion is supported by substantial evidence in the record as a whole and thus should not be reversed.

Finally, Plaintiff asserts that the ALJ erred by not seeking clarification of Dr. Gannon's opinion or asking follow up questions, and instead "left the opinions of Dr. Gannon sitting alone on the record without ever allowing the medical expert an opportunity to explain his opinion." (Doc. No. 22, Pl.'s Reply Mem. 2.) Specifically, Plaintiff contends that the ALJ did not develop the medical record— via Dr. Gannon—to determine whether Plaintiff's condition equaled the medical Listing § 11.08 after 1986. (Doc. No. 9, Pl.'s Mem. 10.) She also argues that

"there is no medical evidence to verify that Plaintiff did not continue to meet the medical listing 11.08 after December 1986", and points to a November 4, 1987[3] note stating that her condition remained unchanged. This Court concludes that Plaintiff's arguments lack merit. (*Id.*)

First, "the ALJ [is] not duty-bound to further develop the record by asking the *treating physician* for more information." *Stormo*, 377 F.3d at 806 (emphasis added). Consequently, the ALJ is also not required to further develop the record by seeking additional information from a non-treating, non-examining physician. While the ALJ does "have to seek additional clarifying statements from *a treating physician* [when] a crucial issue is undeveloped," *Id.* (emphasis added), this requirement does not pertain to information from a non-treating, non-examining physician to address any gaps in the record. Regardless, it is clear that an ALJ does not have to seek any such information without the presence of an undeveloped crucial issue. *Vossen*, 612 F.3d at 1016.

Here, no crucial issue remained undeveloped and there was no ambiguity to clarify in the medical record. Dr. Gannon testified that Plaintiff met the requirements of Listing § 11.08 through November 1987, and that she subsequently was functioning at the light level (Tr. 54-56). But the ALJ found that Dr. Gannon's conclusion was not supported by the objective record evidence

---

[3]     In her memorandum, Plaintiff lists "1985" as the year of the November 4 note. But there is no such note in the record. Thus, based on Plaintiff's argument that the note came after 1986, this Court assumes that Plaintiff is referring to the November 4, 1987 note.

and was largely based on Plaintiff's subjective complaints about her symptoms and limitations.  Thus, the ALJ discounted Dr. Gannon's opinion that Plaintiff met the requirements of the medical listing during the relevant time period.  The ALJ did not reject Dr. Gannon's opinion based on some ambiguity in his testimony.  Instead, the ALJ explained his reasons for rejecting Dr. Gannon's opinion:  "no spinal cord or significant nerve root abnormalities are documented in the record, and there is no evidence of persistent disorganization of motor function resulting in sustained disturbance of gross and dexterous movements or gait and station. . ."  (Tr. 14.)  The ALJ surveyed the entire medical record, including treatment notes from 1987—after Plaintiff's last insured date—ultimately finding that the medical evidence in the record was inconsistent with Plaintiff's disability claim.  (Tr. 14-15.)  Notably, the ALJ kept the record open for Plaintiff to submit any additional records before he made his decision.  (Tr. 59.)  To the extent Plaintiff had additional medical records that supported her disability claim, she could have provided them to the ALJ.   But Plaintiff nowhere alleges that she submitted additional evidence or, more importantly, that the newly-submitted-evidence was overlooked or disregarded by the ALJ.  Ultimately, the burden of persuasion to prove disability is on Plaintiff.  *Harris v. Barnhart,* 356 F.3d 926, 931 n. 2 (8th Cir. 2004); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987) (noting that the claimant is in a better position to provide information about his own medical condition).  Plaintiff's conclusory allegation that "there is no

medical evidence to verify that Plaintiff did not continue to meet the medical

listing 11.08 after December 1986" falls far short of this obligation.

It is true that the Eighth Circuit has ruled that subsequent medical and

psychiatric evaluations are relevant to the extent they reflect the claimant's

condition on a prior date. *Fowler v. Bowen,* 866 F.2d 249, 252 (8th Cir.1989).

But here, Plaintiff's subsequent medical evaluation evidence undermines

Plaintiff's case rather than supports it. In October 1987, Dr. Taylor noted that

Plaintiff's gait and station were normal, and her cervical and shoulder range

motion was also normal. (Tr. 185.) He also noted that Plaintiff had "good

strength in both lower extremities. She is able to hop on either foot. . ." (*Id.*)

Further, Dr. Taylor gave Plaintiff a "good" future prognosis rating. (*Id.*) Finally,

Dr. Taylor—a doctor who was asked to evaluate Plaintiff by Plaintiff's then

attorney—opined that Plaintiff "has not sustained any permanent disability from

the musculoskeletal system. . .[and that] the patient's complaints have not fully

correlated with the physical findings." (*Id.* at 186.) Then, in November 1987, Dr.

Hutter observed that Plaintiff had normal motor strength—5 out of 5—throughout

both arms. (Tr. 186.) Finally, in November and December 1987, Dr. Timming

failed to note any motor or range of motion deficits. (Tr. 189-190.) These post-

1986 medical evaluation notes further support the ALJ's finding that Plaintiff did

not meet the medical disability listing as of the date last insured. And if Plaintiff is

correct that her condition did not change since 1986, then she was not disabled

22

either before or after 1986.  In sum, this post-1986 medical evidence provides further evidence for the ALJ's decision to discount the opinion of Dr. Gannon.

**B.    Evaluating Credibility**

In evaluating the credibility of a claimant's subjective complaints, the ALJ must consider evidence such as:  (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole.  *Id.*  But the ALJ must detail his reasons for discrediting the testimony.  *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).

Plaintiff asserts that the ALJ failed to give proper consideration to her testimony relating to the degree of her functional limitations.  She contends that the ALJ did not properly consider the *Polaski* criteria in evaluating her subjective complaints and degree of her functional limitations.  Defendant counters that substantial evidence in the record as a whole supports the ALJ's assessment of Plaintiff's credibility and her functional limitations.  Defendant also asserts that the ALJ expressly considered Plaintiff's subjective complaints under the *Polaski* factors, and reasonably found that her claims of disabling limitations were not entirely credible.   This Court agrees.

Here, the ALJ expressly considered Plaintiff's daily activities—that she groomed and bathed herself, took care of the cats and dogs, did dishes, cleaned

the house, read, watched TV, went for walks, cooked, did laundry, drove a car, went shopping, paid bills, handled finances, painted pictures, went to church and ran errands (Tr. 16.)  These were the daily activities Plaintiff herself reported in the  SSA application.  (Tr. 147-154.)  And, at the hearing, Plaintiff testified that she went grocery shopping with her husband, took care of her personal hygiene, and did light housework.  (Tr. 44-45, 48-50.)

Throughout his decision, the ALJ cited to numerous examples in the record that support reducing Plaintiff's credibility:

> The record []documents that other than some mild left upper extremity weakness that was identified on one examination, the claimant maintained good strength in her upper and lower extremities bilaterally, and that she maintained a good range of motion in her upper and lower extremities bilaterally and her back. In addition, radiographic examinations of the claimant's left shoulder and cervical spine revealed no evidence of abnormalities or degenerative changes.  Furthermore, the record documents that the claimant received only limited conservative treatment for her back, and left upper extremity symptoms, and that her symptoms were considered to be mostly musculoligamentous in nature.  Finally, no evidence of cognitive difficulties is documented, and the claimant was not receiving any treatment for psychological symptoms.

(Tr. 16-17.)

Indeed, the ALJ surveyed the entire record, detailing the reasons for not fully crediting Plaintiff's testimony and her subjective complaints.  (Tr. 15-17.)  He also noted that Plaintiff had no reported medication side effects and received only conservative medical treatment.  (Tr. 16.)  As to Plaintiff's work history, the ALJ noted that her earnings record was consistent with limited part-time

employment, which may indicate a lack of interest or need for part time employment or suggest that her lack of employment is unrelated to her impairments. (Tr. 16.) *Cf. Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) ("Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition"). Ultimately, the ALJ found that the objective medical evidence was inconsistent with her complaints of disabling physical limitations, but accommodated her resulting limitations by restricting Plaintiff to a range of light work. To that effect, the ALJ noted that while he considered and gave substantial weight to the opinions of the state agency physicians who concluded that Plaintiff is capable of performing light work, the ALJ did not adopt those opinions in their entirety because he further reduced her RFC to reflect the limitations suggested by Plaintiff's subjective complaints. (*Id.*)

Because the ALJ thoroughly discussed—based on the record evidence— the reasons why Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms are not entirely credible, and because the ALJ utilized the *Polaski* factors in so doing, this Court concludes that the ALJ properly assessed the evidence, and that the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence in the record as a whole. Accordingly, this Court concludes the Commissioner's decision should be affirmed.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's motion for summary judgment (Doc. No. 8), be **DENIED**;

2.    Defendant's motion for summary judgment (Doc. No. 19), be

**GRANTED**;

3.    This case be **DISMISSED WITH PREJUDICE**.


Date: January 7, 2011              s/ Jeffrey J. Keyes
                                  JEFFREY J. KEYES
                                  United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 21, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.